UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LINDA BUCZAKOWSKI,

                              Plaintiff,

         -against-                                    5:18-CV-0812 (LEK/ML)

1199SEIU,

                              Defendant.

---

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Plaintiff Linda Buczakowski commenced the present action against defendant 1199SEIU (the "Union") alleging civil rights violations under Title VII of the Civil Rights Act, the Age Discrimination in Employment Act ("ADEA"), and the Americans with Disabilities Act ("ADA"). Dkt. No. 71 ("Amended Complaint"). Presently before the Court is Defendant's motion for summary judgment, Dkt. No. 84 ("Motion"). For the following reasons, the Court grants the Motion and dismisses the Amended Complaint.

## II.    BACKGROUND

### A.  Factual History

The following facts are undisputed, except where otherwise noted.

Plaintiff was hired by Crouse Hospital, Inc. ("Crouse") as an Emergency Room Patient Access Representative and became a member of the Union on October 8, 2012. Dkt. No. 84-1 ("Defendant's Statement of Material Facts" or "Defendant's SMF") ¶ 1; Dkt. No. 97-1 ("Plaintiff's Response to Defendant's SMF") ¶ 1. Plaintiff was covered by the collective bargaining agreement ("CBA") between the Union and Crouse. Def.'s SMF ¶¶ 3, 16; Pl.'s Resp.

to Def.'s SMF ¶¶ 3, 16. A year later, Plaintiff started to work as a Patient Account Representative Float ("PAR Float") in the business office. Def.'s SMF ¶ 4; Pl.'s Resp. to Def.'s SMF ¶ 4. As a PAR Float, Plaintiff completed various tasks for the business office. Def.'s SMF ¶¶ 5–6; Pl.'s Resp. to Def.'s SMF ¶¶ 5–6. Plaintiff suffered disabling conditions and was out of work on medical disability for twelve weeks, from January 2017 to April 2017. Def.'s SMF ¶¶ 7, 9; Pl.'s Resp. to Def.'s SMF ¶¶ 7, 9.

### 1. Labor-Management Meetings

At the April 13, 2017 Labor-Management Committee meeting, Crouse notified the Union of its decision to reorganize the business office.[1] Def.'s SMF ¶ 55; Pl.'s Resp. to Def.'s SMF ¶ 55. The reorganization process would eliminate and create new job titles. Def.'s SMF ¶ 57; Pl.'s Resp. to Def.'s SMF ¶ 57. According to the Union's bargaining notes, Crouse wanted "Floats gone all together and the other staff will cover each other's work" and the time frame to notify people was the last week of April 2017. Dkt. No. 84-20 ("Union Bargaining Notes") at 3. Warner, Adrienne Valenti, the Union's administrative organizer, and Veronica Clanton, vice chair of the bargaining unit, were present at the April 13, 2017 meeting as members of the Labor-Management Committee. Def.'s SMF ¶¶ 21, 23, 56; Pl.'s Resp. to Def.'s SMF ¶¶ 21, 23, 56. Another meeting was held on April 20, 2017, and the agenda included "continuation of

---

[1]  Plaintiff asserts that there were discussions before April 13, 2017 concerning Plaintiff and her position.  Pl.'s Resp. to Def.'s SMF ¶ 55. To support this position, Plaintiff relies on a May 9, 2017 email from Marty Warner, the chairperson of the bargaining unit, to Plaintiff, saying that "HR and 1199 has been meeting for a few months now to facilitate a smooth transition while they exercise their right to run the Business Office as they deem appropriate." Id.; Def.'s SMF ¶¶ 18–19; Dkt. No. 94-1 at 503. For purposes of this Motion, however, this is not a genuine dispute of material fact since it will not affect the outcome of the suit.

discussion regarding Revenue Cycle Staffing."[2] Dkt. No. 84-19 at 47. Finally, another meeting was held on May 4, 2017, and the agenda included "Business Office postings." Id. at 48. During these meetings, Crouse shared documents with the Union showing the proposed organizational structure, the proposed new line staff structure, business office positions as of April 18, 2017, and new model of positions as of May 4, 2017. See Dkt. Nos. 84-23–84-26. Crouse Director of Human Resources John Bergemann noted that, during this process, the Union raised operational and efficiency questions, which were answered by Crouse, but no concerns after that. Dkt. No. 94-1, Ex. 2 ("Bergemann Deposition") at 35:22–25; 50:6–51:5.

According to the May 4 new model of positions, PAR Float Charlene Fair received the new job title of PAR Cash Applications Rep, and PAR Floats Tawyna Montgomery and Jennifer Obremski would now be in "Follow Up." See Dkt. No. 84-26. Plaintiff and one other employee were listed as a "discussion item." Id. The Union's bargaining notes from the meeting noted that "Linda + Lisa positions to be eliminated." Union Bargaining Notes at 6. The notes further state "PAR Float → Charlene Actually been doing Cash Apps (no floating)" and "PAR Floats to convert to Follow-up (this what she's been doing) Tawya [sic] + Jennifer." Id.

### 2. Parking Spot Request

On April 17, 2017, Plaintiff returned to work. Dkt. No. 94-1, Ex. 1 ("Buczakowski Deposition") at 74:23–25. That same day, she emailed Bergemann to request a parking spot. Def.'s SMF ¶¶ 72–73; Pl.'s Resp. to Def.'s SMF ¶¶ 72–73. From these emails, Bergemann first became aware that Plaintiff was using sick leave and "d[id] not know that at the time of the

---

[2] "Revenue Cycle" appears to refer to the business office.

meeting to discuss the restructuring if [Plaintiff] was on sick leave or not." Bergemann Dep. at 54:7–18.

### 3. Business Office Meeting

Immediately after the May 4, 2017 Labor-Management Committee meeting that Warner, Valenti, and Clanton attended, Crouse held a meeting to inform business office employees of the reorganization. Def.'s SMF ¶¶ 75, 85; Pl.'s Resp. to Def.'s SMF ¶¶ 75, 85. Valenti and Clanton attended the business office meeting and were aware that Plaintiff recently returned to work. Def.'s SMF ¶¶ 86–87; Pl.'s Resp. to Def.'s SMF ¶¶ 86–87. Dorothy DiCarlo, representing management, told the business office employees that the Float position was being eliminated or terminated. Def.'s SMF ¶ 88; Pl.'s Resp. to Def.'s SMF ¶ 88. Clanton clarified that Crouse was not eliminating positions but was just eliminating the "float title." Buczakowski Dep. at 92:24–93:4. DiCarlo then verified that "no positions were being eliminated, terminated." Id. at 94:21–95:6. Defendant asserts that no job descriptions or job assignments were handed out at the meeting, Def.'s SMF ¶ 96, but Plaintiff contends that the three other Floats were assigned positions, Pl.'s Resp. to Def.'s SMF ¶ 96. Even Valenti's Affidavit acknowledged that DiCarlo said that the three other PAR Floats "could continue to do the work they had been doing in the Business Office" and no position had yet been determined for Plaintiff. Dkt. No. 84-36 ¶ 18.

### 4. Atrium Meeting

Shortly after the business office meeting, Bergemann met with Plaintiff and Clanton in the atrium at the hospital. Def.'s SMF ¶ 97; Pl.'s Resp. to Def.'s SMF ¶ 97. Plaintiff asserts that Bergemann told Plaintiff to leave Crouse and apply for Social Security due to her medical condition and that she "had no immune system"; if Plaintiff did not want to do that, she should

retire and apply for Medicare. Buczakowski Dep. at 106:25–107:7. Bergemann claimed that he did not suggest she apply for social security disability, but rather said that she should talk to her physician if she felt she needed social security disability. Bergemann Dep. 76:10–14. Plaintiff stated that her health was none of Bergemann's business. Def.'s SMF ¶ 104; Pl.'s Resp. to Def.'s SMF ¶ 104. After the meeting ended, according to Plaintiff, Clanton said that Bergemann was just giving her information and if she was being terminated, she would have been brought up to the human resources office, and that Clanton "had no problem with what he said to [Plaintiff]." Buczakowski Dep. at 112:22–113:19; 241:18–21. Defendant claims that Clanton tried to explain Bergemann's statements to Plaintiff. Def.'s SMF ¶ 106. Then, Plaintiff told Clanton that this meeting should not have happened, and they discussed Plaintiff's Family and Medical Leave Act ("FMLA") issues. Buczakowski Dep. at 113:20–114:20;  Def.'s SMF ¶ 107; Pl.'s Resp. to Def.'s SMF ¶ 107. Afterwards, Plaintiff spoke to DiCarlo, who said that she "considered [Plaintiff] to be nothing more than a low-level employee with low intelligence, and that she determined that [Plaintiff] was not friendly." Buczakowski Dep. at 115:13–24. There was no Union representation during this conversation, nor did Plaintiff tell the Union about her conversation. Id. at 116:9–17. During this meeting, Plaintiff claims that DiCarlo threatened her "that if [Plaintiff] was to bid into the position that [Plaintiff] wanted, [DiCarlo] would find a reason that [Plaintiff] shouldn't have been there." Id. at 168:15–169:13.

### 5.    *May 5 Union Meeting*

The next day, Plaintiff attended a Union organizing meeting facilitated by Valenti and Clanton.  Def.'s SMF ¶ 112; Pl.'s Resp. to Def.'s SMF ¶ 112. The meeting was to address a raise in Union dues. Buczakowski Dep. at 143:10–14. Plaintiff questioned the Union on what

happened at the business office meeting, and complained that the Union should have alerted the Floats that their job titles might be eliminated earlier in the reorganization process. Id. at 143:15–144:1; Def.'s SMF ¶ 115; Pl.'s Resp. to Def.'s SMF ¶ 115. Plaintiff questioned why she was not given a position. Def.'s SMF ¶ 116; Pl.'s Resp. to Def.'s SMF ¶ 116. Defendant asserts that Valenti explained that the job title had been eliminated, that Plaintiff would be afforded her rights under the CBA, and that there was a job for her at Crouse, Def.'s SMF ¶ 117, but Plaintiff claims that Union representatives did not pay attention to Plaintiff's concerns, Pl.'s Resp. to Def.'s SMF ¶ 117. Plaintiff left the meeting before it ended. Def.'s SMF ¶ 118; Pl.'s Resp. to Def.'s SMF ¶ 118.

### 6. *Events Between May 5 and May 10*

Following the May 5 meeting, Warner, Valenti, and Clanton exchanged emails with Plaintiff in response to her request for assistance regarding the business office reorganization, her right to bid or bump into a position, and the distribution of job descriptions. Def.'s SMF ¶ 120; Pl.'s Resp. to Def.'s SMF ¶ 120. On May 8, 2017, via email, Plaintiff asked Clanton questions about the job duties for the new business office position. Def.'s SMF ¶ 121; Pl.'s Resp. to Def.'s SMF ¶ 121. Clanton responded to Plaintiff by phone on May 8, 2017 to explain that she was having technical difficulties and would get answers as soon as she could. Def.'s SMF ¶ 122; Pl.'s Resp. to Def.'s SMF ¶ 122. Clanton followed up via email on May 9 and encouraged Plaintiff not to wait to bid on a position. Def.'s SMF ¶ 123; Pl.'s Resp. to Def.'s SMF ¶ 123. Plaintiff did not bid on a business office position at that time. Def.'s SMF ¶ 124; Pl.'s Resp. to Def.'s SMF ¶ 124. Plaintiff did not want to bid until she received her job description. Dkt. No. 94-1, Ex. 6 at 505. Plaintiff contacted Warner via email on May 9, 2017 with questions about the

job descriptions for the new business office positions. Def.'s SMF ¶ 126; Pl.'s Resp. to Def.'s
SMF ¶ 126. In her May 9 email, Plaintiff expressed her dissatisfaction with the business office
restructuring, asked for paperwork for a hearing, and stated that if necessary, she would take
actions out of the hospital. Def.'s SMF ¶ 127; Pl.'s Resp. to Def.'s SMF ¶ 127. In response to
Plaintiff's email, Warner told Plaintiff that the Union had been involved in impact bargaining
over the reorganization, that the Union had no basis to claim that Crouse could not run the
business office as it deemed appropriate, and that the Union was working with Crouse to clarify
the job descriptions. Def.'s SMF ¶ 128; Pl.'s Resp. to Def.'s SMF ¶ 128. On May 10, Plaintiff
emailed Clanton and Warner to discuss how she was not included in a training. Dkt. No. 84-28.
Plaintiff's supervisor told her that she can go to the training but only stay for the basic portion.
Id. Warner responded that he will address the training issue with Human Resources. Id.

       *7.  May 11 Incident*

       On May 11, 2017, DiCarlo facilitated a meeting in the Crouse business office to discuss
upcoming changes. Def.'s SMF ¶ 138; Pl.'s Resp. to Def.'s SMF ¶ 138. Plaintiff attended the
meeting, but the Union was not present. Def.'s SMF ¶¶ 139–40; Pl.'s Resp. to Def.'s SMF ¶¶
139–40. After DiCarlo's meeting, Plaintiff met with DiCarlo one-on-one without any Union
representatives. Def.'s SMF ¶¶ 141–42; Pl.'s Resp. to Def.'s SMF ¶¶ 141–42. Plaintiff
questioned DiCarlo on what was decided about her position, and DiCarlo responded by saying
that Plaintiff's position had been eliminated prior to her return to work and that she wanted her
out of the office by the end of that day. Buczakowski Dep. 118:8–14. After meeting with
DiCarlo, Plaintiff initiated a meeting with Bergemann that day, again without Union
representation. Def.'s SMF ¶¶ 143–44; Pl.'s Resp. to Def.'s SMF ¶¶ 143–44. Plaintiff asked

Bergemann about the elimination of her PAR Float position and the business office restructuring.
Def.'s SMF ¶ 145; Pl.'s Resp. to Def.'s SMF ¶ 145. According to Plaintiff, Bergemann said that
her position was eliminated prior to her return to work, and that "he and the union had gotten
together on several occasion and agreed to the elimination of [her] position and only [her]
position." Buczakowski Dep. 125:14–22. Bergemann did not remember whether he said this or if
the position was eliminated prior to Plaintiff's return. Bergemann Dep. at 144:16–145:2.
Bergemann asked HR Manager Lisa Dittrich to come into his office during the meeting with
Plaintiff. Def.'s SMF ¶¶ 84, 148; Pl.'s Resp. to Def.'s SMF ¶¶ 84, 148. Dittrich told Plaintiff to
keep her voice down. Buczakowski Dep. at 127:15–21. Plaintiff had to leave the meeting early to
attend a training session. Id. at 129:3–11. Plaintiff asserts that Bergemann and Dittrich wanted to
talk to her more and said that "if they want[ed] to . . . they could charge [her] with
insubordination for leaving or fire [her] for just cause[.]" Id. at 129:12–24.

      According to Bergemann, Dittrich called Warner, and the parties agreed "to go meet and
go over to the education center and talk to" Plaintiff. Bergemann Dep. at 113:1–17. Dittrich
removed Plaintiff from a training class and brought her into a hallway where Warner was waiting
to meet with them. Def.'s SMF ¶ 150; Pl.'s Resp. to Def.'s SMF ¶ 150. Defendant claims that
Warner told Plaintiff that he was there to help her, Def.'s SMF ¶ 151, while Plaintiff contends
that Warner made a complaint against Plaintiff, told her to leave and come back Monday or she
would be marked as a no-show, and that he did not like her, Pl.'s Resp. to Def.'s SMF ¶¶ 151,
153. Warner told Plaintiff that the job descriptions were still not available. Def.'s SMF ¶ 137;
Pl.'s Resp. to Def.'s SMF ¶ 137. At the end of the meeting, Plaintiff was sent home. Def.'s SMF
¶ 155; Pl.'s Resp. to Def.'s SMF ¶ 155.

### 8. *Disciplinary Hearing*

On May 15, 2017, Plaintiff reported to work at Crouse but was sent home. Def.'s SMF ¶ 164; Pl.'s Resp. to Def.'s SMF ¶ 164. Dittrich called Plaintiff later in the day of May 15, 2017 and asked her to return to Crouse on May 17, 2017 to attend a disciplinary meeting. Def.'s SMF ¶ 166; Pl.'s Resp. to Def.'s SMF ¶ 166. Plaintiff attended the meeting, and received a disciplinary memorandum designating her behavior as a Class C offense. Def.'s SMF ¶¶ 167–68; Pl.'s Resp. to Def.'s SMF ¶¶ 167–68. Plaintiff was suspended for a couple of days, and Dittrich told Plaintiff her vacation time would be applied to the days she was suspended. Def.'s SMF ¶¶ 170–71; Pl.'s Resp. to Def.'s SMF ¶¶ 170–71. Plaintiff asserts that Valenti made no effort to challenge Crouse's actions, stated her agreement with management, and left the meeting without speaking to Plaintiff. Dkt. No. 97-2 ¶ 228. According to Plaintiff, she could either be terminated or she could bump or bid on a position. Buczakowski Dep. at 157:16–158:4. Furthermore, both parties agree that Plaintiff was offered the option to take a severance package if she decided she did not want to bid or bump. Def.'s SMF ¶ 175; Pl.'s Resp. to Def.'s SMF ¶ 175.

### 9. *Bidding and Bumping*[3]

Crouse provided Plaintiff with a list of positions into which she could bid and a list of positions into which she could bump. Def.'s SMF ¶ 172; Pl.'s Resp. to Def.'s SMF ¶ 172. Plaintiff contends that, because she was suspended, she was not qualified under the CBA to bid. Id. Included on the list of positions available to Plaintiff to bump into were business office positions that Montgomery and Fair moved into after the PAR Float title was eliminated. Def.'s

---

[3] While similar terms, bidding under Plaintiff's CBA involved an interview process and a thirty-day training period, whereas bumping has no interview process and the employee has a three-day training period to prove that they can do the job. Buczakowski Dep. at 171:21–172:7.

SMF ¶ 173; Pl.'s Resp. to Def.'s SMF ¶ 173. Since Plaintiff had seniority, she could have used her seniority to bump into Montgomery or Fair's new position. Def.'s SMF ¶ 174; Pl.'s Resp. to Def.'s SMF ¶ 174. Because of DiCarlo's threat from May 4, Plaintiff felt like she had no choice, so she opted to bump on May 22. Buczakowski Dep. at 168:11–171:10; Def.'s SMF ¶ 180. Plaintiff did not discuss this decision with the Union. Id.; Pl.'s Resp. to Def.'s SMF ¶ 180. Around the beginning of June, Patient Access Department Supervisor Dennis Sanabria, and Crouse HR Representative Stacy Varre met with Plaintiff to go over the positions available for her to bump into, and the Union was not present at the meeting. Def.'s SMF ¶¶ 189, 192–93; Pl.'s Resp. to Def.'s SMF ¶¶ 189, 192–93.

### 10. Vacation Requests

Until Plaintiff started her new position, she still had a normal work schedule and continued her float position. Buczakowski Dep. at 168:1–4; 177:13–16. On May 22, Plaintiff emailed Valenti at adriennevalenti@1199SEIU.org to ask her what right Crouse had to use her vacation time as a penalty. Dkt. No. 94-1, Ex. 7 ("May 22 Email")[4]. On June 1, Plaintiff emailed Clanton about a request for vacation time in July that was never approved. Dkt. No. 84-35 at 2. Plaintiff noted that the vacation request was removed and wanted it to be approved since she was aware of other employees who left the business office but kept their vacation time. Id. Clanton

---

[4] Defendants argue that, pursuant to Federal Rule of Civil Procedure 37(c)(1), this exhibit should be struck from the record since it was not produced during discovery. Dkt. No. 95-2 at 3. "The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new evidence." Ebewo v. Martinez, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004). At this time, it is within the Court's discretion to consider this exhibit since the evidence cuts against Plaintiff's argument, which is not the type of "sandbagging" that the Rule is meant to protect against. See infra Section IV(B); cf. Lore v. City of Syracuse, No. 5:00-CV-1833, 2005 WL 3095506, at *3 (N.D.N.Y. Nov. 17, 2005) ("The decision whether to consider documents that are untimely filed rests within the sound discretion of the district court.").

responded that they did not find Plaintiff's July request. Id. at 3. Plaintiff said that she should

have a copy of her vacation request. Id. Clanton then told Plaintiff to submit proof that she did in

fact put in for that requested time. Id. Furthermore, Clanton clarified that she reached out to

Plaintiff's department and the IT department to see if a request had been made and taken down.

Id. The only request they saw was one for June 2, and that one was approved. Id. at 3–4. The

July request was not for a medical reason. Pl.'s Resp. to Def.'s SMF ¶ 186.

### 11.  *New Position and Resignation*

On June 5, Plaintiff started her new position. Buczakowski Dep. at 197:18–20. At the

beginning of her first shift, Plaintiff was brought into a meeting with Sanabria, Plaintiff's

manager Amber Irving, and Clanton. Def.'s SMF ¶ 195; Pl.'s Resp. to Def.'s SMF ¶ 195. During

the meeting, Clanton attempted to explain to Plaintiff how her time off requests would be

handled, and that it would not be approved because there were many more people with higher

seniority than Plaintiff. Def.'s SMF ¶ 196; Pl.'s Resp. to Def.'s SMF ¶ 196. Plaintiff expressed a

concern about the person she had bumped from and her concern that her coworkers did not

support her success in the new position. Def.'s SMF ¶ 197. Later that day, Plaintiff resigned

from her new position. Def.'s SMF ¶ 203; Pl.'s Resp. to Def.'s SMF ¶ 203.

### B.  Procedural History

Plaintiff commenced this case on July 10, 2018. Dkt. No. 1 ("Complaint"). Defendant

moved to dismiss the Complaint on September 18, 2018. Dkt. No. 7. This Court granted

Defendant's motion to dismiss in part, specifically dismissing the Title VII and ADEA claims

without prejudice and allowing the ADA claim to proceed. See generally Dkt. No. 31

("November 2019 Decision"). Plaintiff filed a motion for reconsideration on January 3, 2020.

See Dkt. No. 34. This Court denied the motion for reconsideration and allowed Plaintiff to

replead her Title VII and ADEA discrimination and retaliation claims and her ADA retaliation

claim within sixty days. See Dkt. No. 50 ("May 2020 Decision"). Plaintiff filed a motion to

amend her Complaint on July 1, 2020, Dkt. No. 62, and the Court granted the motion, Dkt. Nos.

70, 71 ("Amended Complaint"). Defendant filed its motion for summary judgment on December

18, 2020. Motion. Plaintiff responded on March 4, 2021, Dkt. No. 94, and Defendant filed a

reply on March 10, 2021, Dkt. No. 95.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under

the governing law," and a dispute is "'genuine' ... if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude

summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d

43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the

nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis

for the motion and identifying those portions of the record that the moving party claims will

demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party

has failed "to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its

initial burden, the nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all

reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary

judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo

v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.   DISCUSSION

The Court will first address the merits of Defendants' summary judgment motion as to

each of Plaintiff's claims, and then a few remaining issues.

### A.  Title VII

Title VII makes it illegal for a labor organization to "discriminate against[] any

individual because of his race, color, religion, sex, or national origin" or to "cause or attempt to

cause an employer to discriminate against an individual in violation of this section." 42 U.S.C. §

2000e-2(c). This Court previously dismissed Plaintiff's Title VII claim without prejudice,

November 2019 Decision at 19, and allowed Plaintiff to replead her Title VII discrimination and

retaliation claims, May 2020 Decision at 8. Plaintiff's Amended Complaint still contains no

allegations that the Union discriminated against her based on race, color, religion, sex or national

origin. Tellingly, Plaintiff's memorandum of law is only focused on age and disability

13

discrimination and does not address the Title VII claim. See Dkt. No. 94-5 ("Plaintiff's Memorandum of Law"). Thus, the Title VII theory has been abandoned. See, e.g., NML Capital, Ltd. v. Republic of Argentina, No. 05-CV-2434, 2009 WL 1528535, at *1 (S.D.N.Y. May 29, 2009) (holding that party waived argument by failing to address it in opposition to motion for summary judgment); Gortat v. Capala Bros., Inc., No. 07-V-3629, 2010 WL 1423018, at *11 (E.D.N.Y. Apr. 9, 2010) (considering an argument not addressed in an opposition brief waived).

Even if the Title VII claim was not abandoned, Plaintiff has put forth no evidence that the Union's actions were motivated by animus towards any of her Title VII protected characteristics. Because the Court is dismissing this claim on other grounds, it will not consider Defendant's argument that Plaintiff failed to exhaust her administrative remedies on her Title VII claim. Dkt. No. 84-2 at 18 n.10. Therefore, summary judgment is warranted on the Title VII claim.

### B.  ADEA and ADA

The ADEA prohibits labor organizations from discriminating "against any individual because of "age," or causing or attempting to cause employers to do the same. 29 U.S.C. § 623(c). Similarly, the ADA makes it illegal for unions to "discriminate against a qualified individual on the basis of disability." See 42 U.S.C. §§ 12111(2), 12112(a). A claim brought against a labor organization under the ADEA or ADA requires a plaintiff to demonstrate: (1) that the union breached its duty of fair representation ("DFR"); and (2) that the breach was motivated by discriminatory intent with respect to age or disability. McIntyre v. Longwood Cent. Sch. Dist., 380 F. App'x 44, 49 (2d Cir. 2010); Klaper v. Cypress Hills Cemetery, No. 10-CV-1811, 2012 WL 959403, at *12 (E.D.N.Y. Mar. 21, 2012).

A union's liability can also be predicated on its "role in ratifying an employer's discriminatory practice" or in "tacit acquiescence in an employer's discriminatory practices." Nweke v. Prudential Ins. Co. of Am., 25 F. Supp. 2d 203, 220 (S.D.N.Y. 1998) (quoting United States v. City of Buffalo, 457 F. Supp. 612, 639 (W.D.N.Y. 1978)). However, this ratification acquiescence must rise to the level of a breach of the DFR, or, in other words, it must itself be "arbitrary, discriminatory, or in bad faith." Klaper, 2012 WL 959403 at *7.

Plaintiff argues that a "reasonable fact finder could conclude that Plaintiff was discriminated against, the union participated or acquiesced in the discrimination, and that Plaintiff was constructively terminated." Pl.'s Mem. of Law at 4. To support this argument, Plaintiff points to the following: (1) the elimination of Plaintiff's position and the Union's cover-up; (2) disparate treatment of Plaintiff in comparison to her younger, non-disabled co-workers; (3) Bergemann's statements to retire and apply for Medicare; (4) threats to forcibly remove Plaintiff and discipline; and (5) the denial of an accommodation for Plaintiff's disability. Id. at 4–7. For purposes of this Motion, unless stated otherwise, the Court will assume that Plaintiff has raised a triable issue of fact regarding whether the Union breached its DFR, and the analysis will be limited to discriminatory animus. As for the elimination of the position and corresponding cover-up, Plaintiff has put forth no evidence that the Union's actions were motivated by age and disability animus. Similarly, even if that was the case, Warner's actions on May 11 do not show that the Union acted with discriminatory intent, especially when Plaintiff admits that Warner only said that he did not like her. See Ayazi v. United Fed'n of Tchrs., Loc. 2, No. 99-CV-8222, 2011 WL 888053, at *24 (E.D.N.Y. Mar. 14, 2011) ("In the absence of remarks or actions based on plaintiffs [sic] disability, simple allegations of hostility by a Union

15

official are not sufficient to support a claim that the Union acted with discriminatory intent."). Also, Plaintiff has put forth no evidence that Valenti's actions (or inaction) during the disciplinary meeting were motivated by animus toward her protected statuses. Finally, Plaintiff's assertion that Valenti ignored Plaintiff's email requesting information about the Union contract's provisions allowing Crouse to use vacation time as a disciplinary action is meritless because it was Plaintiff who used an incorrect email address to contact Valenti. Compare May 22 Email ("adriennevalenti@1199SEIU.org") with Dkt. No. 84-34 ("adrienne.valenti@1199.org"). If a union's negligence does not amount to a breach of its DFR, Trivedi v. N.Y.S. Unified Ct. Sys. Off. of Ct. Admin., 818 F. Supp. 2d 712, 725 (S.D.N.Y. 2011), there is certainly no way a Union member's mistake alone can amount to a breach of the Union's DFR.

Instead, as evidence of discriminatory animus, Plaintiff points to the fact that younger, non-disabled co-workers were treated more favorably than Plaintiff, that Clanton "had no problem with Bergemann telling Plaintiff that she should retire and apply for Social Security Disability and Medicare", and that "Clanton[] and Irving[] refus[ed] to accommodate for Plaintiff's medical appointments." Pl.'s Mem. of Law at 7–9. The Court analyzes each in turn.

1. *Disparate Treatment*

Plaintiff argues that the Union did nothing to challenge the unfair treatment Plaintiff was receiving. Id. at 7. Specifically, Plaintiff notes that her younger, non-disabled co-workers received job descriptions, were provided training, and were not required to bump. Id. at 5.

These instances, while they may have been personally unfair to Plaintiff, do not show that they were discriminatory. The record reveals that Plaintiff's complaints to the Union were framed in terms of seniority, not age or disability. See Dkt Nos. 84-27 ("At the meeting with the

union on Friday [two PAR Floats] both stated they had no training in this specific area and will

need training to do the job of payment, follow-up. I on the other hand have been in this

department for 4years and 7 months..."); 84-28 ("As you already know my complaint about how

two floats with less seniority that require training ... have been placed in positions ... They are

presently attending the Soarian training[, I] was not included."). Plaintiff's seniority rights are

not a protected characteristic under the ADEA. See Robles v. Cox & Co., 987 F. Supp. 2d 199,

209 (E.D.N.Y. 2013) ("Nothing in the ADEA [] suggests ... that seniority is a protected

characteristic."); Williams v. City of New York, No. 12-CV-8518, 2014 WL 1383661, at *11

(S.D.N.Y. Mar. 26, 2014) ("The Supreme Court has held that the termination of an employee

based solely on financial considerations related to the employee's seniority is not actionable

under the ADEA") (citing Hazen Paper Co. v. Biggins, 507 U.S. 604, 613 (1993)). "Hazen

explained that while seniority may be 'empirically correlated' with age, it is 'analytically

distinct' such that discrimination on the basis of the former does not necessarily constitute

discrimination on the basis of the latter." Id. (citing Hazen, 507 U.S. at 608–11).

Here, Crouse's alleged disregard of Plaintiff's seniority rights is not actionable under the

ADEA and there is nothing to show that Plaintiff complained to the Union about her disability.

That Plaintiff was over the age of forty and had a disability does not mean that Crouse's and the

Union's actions were because of her age or disability. See, e.g, Collado v. B'Way Corp., No. CV

16-604, 2016 WL 1572541, at *5 (D.N.J. Apr. 19, 2016) ("Regardless of the statute under which

Plaintiff seeks relief, a party attempting to prove employment discrimination based upon a

protected trait must show more than membership in a protected class and an employment

termination."). Moreover, Plaintiff has not put forth evidence showing that the Union's failure to act was motivated by age and disability animus.

Plaintiff attempts to circumvent this by arguing that "[f]acts showing preferential treatment to employees outside Plaintiff's protected class constitute[] evidence of discrimination which cannot be ignored." Pl.'s Mem. of Law at 7. While this may be true, Plaintiff notes in her affirmation that she was older than the other PAR Floats and "none had any known disabling conditions nor had they taken FMLA leave." Dkt. No. 94-2 ¶ 4. This information was not produced during discovery; in fact, the only information produced was that another PAR Float had more seniority than Plaintiff. Buczakowski Dep. 54:5–9; Dkt. Nos. 84-25–84-26.

"[T]here is nothing wrong with self-serving affidavits and declarations, provided they are supported by the facts in the record and satisfy the usual requirements for affidavits and declarations...." Dieffenbauch v. Rhinehart R.R. Constr., Inc., No. 17-CV-1180, 2021 WL 736885, at *1 n.2 (N.D.N.Y. Feb. 25, 2021) (Kahn, J.) (quoting 11 MOORE'S FEDERAL PRACTICE - CIVIL § 56.94[3]). Here, because there are no facts in the record to support that Plaintiff was older and that none of the other PAR Floats had a known disability, the Court will not consider information that was brought by Plaintiff at the eleventh hour since there was no evidence that Plaintiff's failure was substantially justified or harmless. Cf. Feldman v. Sanders Legal Grp., 914 F. Supp. 2d 595, 597 n.2 (S.D.N.Y. 2012) ("Because the document filed as Exhibit C to Defendant's Memorandum of Law and Exhibit B to Defendant's Rule 56.1 Statement, which is neither authenticated nor executed, was not produced during discovery, it has not been considered by the Court.").

### 2. Plaintiff's Acquiescence Theory

Next, the Court analyzes Plaintiff's claim that Clanton "had no problem with Bergemann telling Plaintiff that she should retire and apply for Social Security Disability and Medicare[.]" Pl.'s Mem. of Law at 8.

In resolving whether the Union ratified or acquiesced to Crouse's discriminatory practice, there must be a showing of discrimination on the part of Crouse. See Nweke, 25 F. Supp. 2d at 224 (S.D.N.Y. 1998) ("After all, the [u]nions cannot be said to have condoned or ratified a discriminatory practice absent a showing of discrimination on the part of [employer]."); cf. Durant v. Union Loc. 237, No. 12-CV-1166, 2013 WL 1232555, at *3 (E.D.N.Y. Mar. 4, 2013), report and recommendation adopted, No. 12-CV-1166, 2013 WL 1247520 (E.D.N.Y. Mar. 26, 2013) ("[A]ny claim that the Union unlawfully acquiesced in [employer's] discriminatory or retaliatory conduct is also untenable because plaintiff has failed to plausibly allege that [employer] discriminated or retaliated against her.").

At this time, the Court does not need to resolve whether the comment was indicative of a discriminatory behavior. Instead, the Court is not convinced that the Union acquiesced in Crouse's alleged discriminatory behavior. "Acquiescence requires (1) knowledge that prohibited discrimination may have occurred and (2) a decision not to assert the discrimination claim." Badlam v. Reynolds Metals Co., 46 F. Supp. 2d 187, 200 (N.D.N.Y. 1999) (internal citations omitted). Although Badlam was a Title VII case, it is still instructive on how this Court approaches an ADEA or ADA case. See E.E.O.C. v. Staten Island Sav. Bank, 207 F.3d 144, 151 (2d Cir. 2000) ("Moreover, Title VII of the Civil Rights Act of 1964, to which this Court has looked in interpreting the ADA . . . has as its 'principal focus . . . the protection of the individual

employee.'") (citations omitted); Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180 (2d Cir. 1992) ("Similarly, our interpretations of the ADEA have relied on interpretations of Title VII, for the substantive provisions of the ADEA were derived [from] from Title VII.") (citations and quotation marks omitted) (emphasis in original). In Badlam, the CBA contained an anti-discrimination provision, but although the employee was aware of her ability to file grievances, she never requested that the union file a grievance on her behalf. 46 F. Supp. 2d at 201. Therefore, "[w]ithout the filing of a written grievance or otherwise specifically requesting that the [u]nion pursue a grievance to the next step, the [u]nion was under no obligation to take further action on her behalf," "it [could not] be said that the [u]nion acquiesced in any sex-based discrimination at Reynolds." Id.

Here, Plaintiff cannot show that the Union acquiesced to Crouse's discriminatory behavior when Clanton said she had no problem with Bergemann's statement. Even if Clanton had knowledge that prohibited discrimination may have occurred, a decision not to assert the discrimination claim was absent. The record reveals that Plaintiff was covered by a non-discrimination provision in the CBA, Dkt. No. 84-22 at 29 ("Neither the Hospital nor the Union will discriminate against any bargaining unit Employee because of . . . disability, . . . age,"), and Plaintiff never filed a grievance or requested the Union's assistance in pursuing a non-discrimination grievance against Bergemann. Plaintiff clearly knew about the grievance procedure because, only a few days later, Plaintiff sought to pursue a grievance in relation to the restructuring. Def.'s SMF ¶ 127; Pl.'s Resp. to Def.'s SMF ¶ 127. Thus, there is no evidence that Union acquiesced in prohibited age and disability discrimination.

### 3. Denial of Vacation

Finally, the Court analyzes the refusal to accommodate for Plaintiff's medical appointments.

"Claims alleging intentional discrimination in violation of the ADA are subject to the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)," McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013), in which the initial burden is on the plaintiff to establish a prima facie case of discrimination, Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006). To establish a prima facie case of disability discrimination under the ADA, the plaintiff must show that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Petrone v. Hampton Bays Union Free Sch. Dist., 568 F. App'x 5, 7 (2d Cir. 2014). "The burden on a plaintiff to establish a prima facie case is de minimis." Umanzor v. New York City Police Dep't, No. 14-CV-9850, 2018 WL 840084, at *4 (S.D.N.Y. Feb. 12, 2018). Ordinarily, once a plaintiff establishes a prima facie case of disability discrimination, the burden flips to the defendant under McDonnell Douglas to "offer . . . a legitimate non-discriminatory reason for the [adverse action]." Sista, 445 F.3d at 169. "If the defendant does so, the burden returns to the plaintiff to show that the defendant's proffered reason was a mere pretext for discrimination." Lai v. DeIorio Foods, Inc., No. 15-CV-0195, 2018 WL 987258, at *3 (N.D.N.Y. Feb. 20, 2018) (Kahn, J.) (internal citations and quotation marks omitted).

"Discrimination under the ADA includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008) (quoting 42 U.S.C. § 12112(b)(5)). A plaintiff establishes a failure-to-accommodate claim by demonstrating that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [plaintiff's] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." McMillan, 711 F.3d at 125–26. "The employer has a duty to respond to requests for reasonable accommodation, but it is the employee's responsibility to make the request." Mohammadian v. Ciba Vision of Puerto Rico, Inc., 378 F. Supp. 2d 25, 30 (D.P.R. 2005).

The record establishes that Plaintiff requested *vacation* time for June and July. Dkt. No. 84-35. The CBA governs vacation requests, and specifically states that "[w]hen there are multiple requests for the same vacation period, timely requests that can be granted, will be granted in order of bargaining unit seniority." Dkt. No. 84-22 at 49. The CBA also had provisions governing unpaid leaves of absence. See id. at 65–66. The Court finds the Union's argument persuasive that there were "no facts to show, that she ever made an accommodation request or attempted to use Articles 28.10 or 28.11 of the CBA, much less that she was denied such request." Dkt. No. 95-2 at 8. Plaintiff was not relieved of her responsibility to make the

accommodation request and her failure to request accommodation warrants summary judgment in favor of the Union.

Instead, Plaintiff's argument is that since the Union and Crouse knew that she was saving up her vacation time for medical appointments, Buczakowski Dep. 179:23–180:25, the denial of her vacation time was illegal under the ADA. Assuming this was the case and Plaintiff was able to establish a prima facie case, the Union gave Plaintiff a legitimate non-discriminatory reason for the denial of vacation time: her low seniority. Buczakowski Dep. 200:19–20 ("because there are so many more people with higher seniority . . . my time would not be approved"). The burden thus shifts back to Plaintiff to show that the reason was pretextual. Other than her subjective beliefs, Plaintiff has not provided any evidence by a which a reasonable jury could find that Defendant's articulated reason was false or a pretext for discrimination. See also Karim–Seidou v. Hosp. of St. Raphael, No. 09–CV–51, 2012 WL 6628886, at *5 (D. Conn. Dec. 19, 2012) (the plaintiff's "own subjective beliefs" that he was discriminated against based on protected characteristics were insufficient to survive summary judgment).

Accordingly, Defendant's motion for summary judgment on Plaintiff's ADEA and ADA claims is granted.

### C.  Remaining Issues

In Defendant's reply brief, it points out several issues with Plaintiff's 56.1(b) Responses. See Dkt. No. 95-2 at 1–5. Besides the instances referenced above, the Court need not address whether Plaintiff's Rule 56.1(b) Responses are deficient because it grants Defendant's Motion on the merits.

23

**V.      CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Defendant's motion for summary judgment (Dkt. No. 84) is

**GRANTED**; and it is further

**ORDERED**, that the Amended Complaint (Dkt. No. 71) is **DISMISSED**; and it is

further

**ORDERED**, that the Clerk is directed to close this action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      June 07, 2021
            Albany, New York

Lawrence E. Kahn
U.S. District Judge

24